NOT DESIGNATED FOR PUBLICATION

No. 116,986

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.M. and A.M.M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Ford District Court; SIDNEY R. THOMAS, judge. Opinion filed July 14, 2017. Affirmed.

*Andrew M. Stein*, of Doll Law Firm, LLC, of Dodge City, for appellant natural mother.

*Mark A. Cowell*, of Larned, for appellant natural father.

*Kathleen Neff*, assistant county attorney, and *Kevin Salzman*, county attorney, for appellee.

Before MALONE, P.J., LEBEN and BRUNS, JJ.

*Per Curiam*.: K.K. (Mother) and A.M. (Father) jointly appeal the district court's decision terminating their parental rights of their two minor children, A.M., a female born in 2011, and A.M.M., a male born in 2013. Following a nearly 2-year attempted reintegration process, the district court found by clear and convincing evidence that both parents were unfit, that the condition was unlikely to change in the foreseeable future, and that it was in the best interest of the children to terminate the parental rights. For the reasons stated herein, we affirm the district court's judgment.

1

On October 25, 2014, A.M.M., who was not quite 2 years old, was brought by his parents to the emergency room of the Kiowa County Memorial Hospital in Greensburg. Bonnie McVey, a registered nurse, was on duty in the emergency room. McVey observed that A.M.M. had a broken leg and bruising on his face. He was eventually transferred to Via Christi Hospital in Wichita due to his injuries. A.M.M.'s leg injury ultimately was diagnosed as a "spiral fracture of the midshaft of the left femur."

Dr. J. Elizabeth Heflin, a pediatrician with training to recognize child abuse, evaluated A.M.M. at Via Christi. The parents told Heflin that A.M.M. had been pulled down the steps by the family's husky-mix dog when its leash became wrapped around A.M.M.'s leg as the dog was being let outdoors. Heflin found that A.M.M.'s injuries to "his face were most consistent with . . . a blow from an adult-sized hand." Heflin did note that A.M.M.'s femur fracture could have been consistent with the parents' story of being "wrapped in a leash and drug." Heflin also admitted that the bruising could have occurred in a tumbling incident, as in tumbling down stairs, but not normally in the "pattern and configuration of bruising" exhibited on A.M.M. Heflin found physical abuse to be "the most likely thing" that caused A.M.M.'s injuries.

Leatha Benson, a social worker specialist with the Department for Children and Families (DCF) in the Dodge City office, investigated the allegations that A.M.M. had been abused. At some point, the Wichita Police Department placed A.M.M. into protective custody. After receiving information from the Wichita office following a courtesy interview with the parents, Benson and her supervisor decided that A.M.M.'s older sister, A.M., should also be placed into protective custody. The children were placed "into police protective custody" on October 28, 2014.

On October 29, 2014, the State filed petitions requesting the district court to find that A.M. and A.M.M. were children in need of care (CINC). The children were placed in the custody of DCF on October 30, 2014.

The district court held an adjudication hearing on December 31, 2014. After receiving evidence, the district court filed a journal entry of adjudication and disposition on January 2, 2015.

As part of a case plan toward reintegration, Dana Schatz, with the Russell Child Development Center, administered the Triple-P program to both parents. Triple-P stands for Positive Parenting Program. Both parents were enrolled in the Level Four Triple-P program. Level Four of the program is approximately 10 1-1.5 hour sessions. Schatz indicated that both parents initially were participating in the program

During the third session at the parents' home, Schatz stated that Father did not participate and instead sat in front of Schatz and Mother "playing video games." During the next session, Father again played video games. Father was absent at the fifth session. The sixth session occurred during a supervised visitation with the children. Schatz stated that Father was distracted by his phone during the session and had little interaction with the children. Both parents participated during the seventh and eighth sessions. Schatz had one final interaction at a supervised visitation at which Father was absent. Ultimately, Mother "received 10 hours of level four Triple-P." Father completed 6 hours of Triple-P.

Julia Marquez, a family support worker at Saint Francis Community Service (SFCS) at the time of this incident, also worked with the parents. When A.M. was taken into custody, she was not potty-trained despite being approximately 3 years old. Marquez stated that A.M. "wasn't used to the word no" and would have a tantrum if told no. This included physical altercations with the foster parents. A.M. had a limited vocabulary and

3

Marquez testified that A.M. talked "[v]ery little" and "was hard to understand." A.M.M. also would throw fits.

Marquez noted that there was a great deal of difficulty communicating with the parents. The parents sporadically had cell phones and were asked to maintain contact with Marquez and the other staff members. However, it was often difficult for Marquez to contact the parents especially when they were supposed to come in for a urinalysis.

Visits were suspended temporarily after criminal charges were filed against both parents stemming from the alleged child abuse. Both parents had a no-contact order with the children during that period of time. Ultimately, Father was convicted of felony child abuse and Mother was convicted of felony interference with a law enforcement officer and conspiracy to commit obstruction of prosecution.

During most of the reintegration process, Mother and Father resided with Father's mother, Maria, and her boyfriend. Maria had recently "relinquished her [parental] rights on two of her daughters," who were Father's sisters. Due to this action, reintegration was not possible as long as Mother and Father continued living in the home with Maria.

Marquez testified that during visits with the children, Mother was the only one interacting with them. In order for Father to interact, the children would have to approach him. During most of the visits, Father was on his phone and even fell asleep during one visit. Both parents had to be told not to use foul language in front of the children.

Both parents, but especially Father, had poor work histories. Mother worked at a Subway in Dodge City and indicated she was seeking a second job at Arby's. Mother then claimed to have obtained new employment with Tyson. However, after speaking with Tyson, Marquez was told "there was no record of [Mother] ever working there." Mother subsequently went back to work at the Subway in Garden City. To Marquez' knowledge,

4

Father was not working. During the entirety of the process, Father was employed with Tyson "for about a week," and worked at the Flying-J for "one hour."

Marquez stated the only real case plan task the parents completed was Mother getting a job. Marquez also testified that she did see some improvement in parenting from Mother. When asked how close the parents were to reintegration, Marquez stated: "They weren't. They weren't close at all." When asked what was missing, Marquez testified: "They were not stable in employment. They didn't have stable housing. They hadn't finished the parenting classes or the psychological evaluation. Visits were still being [supervised]." Father, through community corrections, had a urinalysis positive for methamphetamine but never had a positive urinalysis with SFCS. Father and Mother missed numerous drug screenings, which counted as a positive.

Barbara Clark, a social worker with SFCS, also was involved with the case. Clark stated that the visits with the children were still supervised because she had "not seen [the] improvement that needs happen with these parents." Clark also stated: "There has been little to no change in parenting in the two years that we've been supervising."

Since Father did not fully participate in the Triple P program, Clark arranged for him to take a different parenting program, but Father did not participate in the program and he was still not employed. Clark stated that stable housing with the parents was still absent. When asked for her professional opinion about the likelihood of reintegration with the parents, Clark stated: "I don't think that they can parent them safely and adequately together for the children to be able to grow and be safe." When asked if this condition could be changed in the reasonably foreseeable future, Clark stated: "I don't think so. I think that if they wanted to change that, that would have taken place by now."

The "case plan goal" was formally changed to adoption on December 3, 2015. On March 23, 2016, the State filed a motion for termination of parental rights. A hearing was

5

held on October 12, 2016. After hearing the evidence and receiving closing arguments from all interested parties, the district court issued its written findings on October 24, 2016. The district court listed the following factors from K.S.A. 2016 Supp. 38-2269(b) and (c) in its analysis of the motion for termination of parental rights:

"(b)(2) conduct toward a child of a physically, and/or emotionally abusive nature;

"(b)(4) physical, mental or emotional abuse or neglect of a child;

"(b)(5) felony convictions by both parents[;]

"(b)(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

"(b)(8) lack of effort on the part of the parents to adjust their circumstances, conduct or conditions to meet the needs of the children; and

"(b)(9) since the children have been out of home for an extended amount of time as a result of the parents' actions and inactions subsection (c) also applies:

"(c)(1) Failure to assure care of the child in the parental home when able to do so;

"(c)(2) failure to maintain regular visitation, contact or communication with the child and the custodian of the child;

"(c)(3) failure to carry out a reasonable plan approved by the Court directed toward the integration of the child into the parental home; and

"(c)(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay and work."

Based on the evidence, the district court found that both parents were unfit by reason of conduct or condition which rendered them unable to care properly for the minor children and that the conduct or condition was unlikely to change in the foreseeable future. The district court found termination of both parents' rights was in the best interests of the children. Both parents have appealed from that ruling.

The revised Kansas Code for Care of Children provides that when a child has been adjudicated to be a child in need of care, the court may terminate parental rights when the

6

court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2016 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2016 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2016 Supp. 38-2269(c). Any one of the factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2016 Supp. 38-2269(g)(1).

When an appellate court reviews the district court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence that the child was a CINC. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (applying standard of review). In addition to CINC adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2016 Supp. 38-2269(a). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Appellate review of the best-interests determination is made under the traditional abuse of discretion standard. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903

7

(2014). Abuse of discretion "occurs when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error." 50 Kan. App. 2d at 1116.

TERMINATION OF FATHER'S PARENTAL RIGHTS

On appeal, Father maintains that the district court erred when it found "reasonable efforts had been made by appropriate private and public agencies to rehabilitate the family." Father points out that he was arrested on the felony child abuse charge, had a "lengthy jail stay," and a subsequent no-contact order with his children and Mother following adjudication in the abuse case. Father argues that the "actions by the State of Kansas in arresting the parents and holding them in jail only to release them but not allow contact completely undermined the reintegration efforts that the parents had made."

The district court terminated Father's parental rights based on the statutory factors set forth in K.S.A. 2016 Supp. 38-2269(b)(2), (b)(4), (b)(5), (b)(7), (b)(8), (c)(1), (c)(2), (c)(3), and (c)(4). Our task on review is to determine whether the district court's findings under each statutory subsection were supported by clear and convincing evidence. Admittedly, some of the separate statutory subsections are similar in nature and overlap; but the district court's factual findings to support termination under one statutory subsection may also support termination under a separate subsection.

*(b)(2) conduct toward a child of a physically, and/or emotionally abusive nature*

There was clear and convincing evidence that Father physically abused A.M.M. Dr. Heflin testified that A.M.M.'s injuries to "his face were most consistent with . . . a blow from an adult-sized hand." Heflin found physical abuse to be "the most likely thing" that caused A.M.M.'s injuries. Ultimately, Father was convicted of felony child abuse. Moreover, the evidence established that Father emotionally abused both children by failing to properly care for them in the home and by failing to visit the children when he

8

had the opportunity to do so. Thus, there was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(b)(2).

*(b)(4) physical, mental or emotional abuse or neglect of a child*

The same evidence to establish termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(b)(2) also supports termination of his parental rights under subsection (b)(4).

*(b)(5) felony convictions by both parents*

As previously stated, Father ultimately was convicted of felony child abuse. Thus, there was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(b)(5).

*(b)(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family*

Schatz testified about the services she provided through the Triple P program. Because Father did not fully participate in that program, Clark arranged for him to take a different parenting program, but Father did not participate in the program. Marquez and Clark of SFCS testified extensively about the efforts of their agency to rehabilitate the family. Marquez testified that it was difficult to communicate with Father and he failed to maintain contact with the agency, especially when he was supposed to come in for drug testing. Marquez and Clark both testified that the agency provided many opportunities for Father to visit with the children, but Father either missed the visitation opportunities or he failed to properly interact with the children during visitation. Father claims that he never had a chance to carry out the case plan because of his "lengthy jail stay" and a subsequent no-contact order with the children, but this claim is not supported by the record. The evidence at the termination hearing established that Father had many opportunities to

9

complete parenting classes and visit with the children but he squandered those opportunities by his own immature conduct. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(b)(7).

*(b)(8) lack of effort on the part of the parents to adjust their circumstances, conduct or conditions to meet the needs of the children*

Schatz testified that Father's efforts in participating in the Triple P program were certainly less than expected. Father missed several sessions and played video games in other sessions. In order for Father to interact with the children during SFCS visits, the children would have to approach him. During most of the visits, Father was on his phone, and he even fell asleep during one visit. Father's job history was almost nonexistent. During the entirety of the reintegration process, Father was employed with Tyson "for about a week," and he worked at the Flying-J for "one hour," even though employment was a part of reintegration. Father also failed to provide stable housing for the children. He continued to reside with his mother, Maria, and her boyfriend throughout most of the reintegration process even though Maria had recently relinquished her parental rights of two of her daughters. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(b)(8).

*(c)(1) failure to assure care of the child in the parental home when able to do so*

The evidence established that when A.M. was taken into custody, she was not potty-trained despite being approximately 3 years old. Marquez testified that A.M. "wasn't used to the word no" and would have a tantrum if told no. This included physical altercations with the foster parents. A.M. had a limited vocabulary and Marquez testified that A.M. talked "very little" and "was hard to understand." A.M.M. also would throw fits. As previously discussed, Father continued to reside at his mother's home during the reintegration process even though his mother had recently relinquished her parental rights

10

of her two daughters. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(c)(1).

*(c)(2) failure to maintain regular visitation, contact, or communication with the child and the custodian of the child*

As previously discussed, Marquez noted that there was a great deal of difficulty communicating with the parents, especially when it was time for drug testing. Further, in order for Father to interact with the children, the children would have to approach him. During most of the visits, Father was on his phone and was even falling asleep during one visit. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(c)(2).

*(c)(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home*

Father was absent or played video games throughout the Triple P program. Since Father did not fully participate in the Triple P program, Clark arranged for him to take a different parenting program, but Father did not participate in the program and he was still not employed. During the entirety of the reintegration process, Father was employed with Tyson "for about a week," and he worked at the Flying-J for "one hour," even though employment was a part of reintegration. Father, through community corrections, had a urinalysis positive for methamphetamine. Father missed numerous drug screenings, which counted as a positive. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(c)(3).

*(c)(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay and work*

The evidence established that Father owed, at the time of the termination hearing, $3,952.50 in back child support. There was clear and convincing evidence to support termination of Father's parental rights under K.S.A. 2016 Supp. 38-2269(c)(4).

To sum up, as we have previously stated, any one of the factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. After review of all of the evidence in the record, viewed in the light most favorable to the State, we conclude there was clear and convincing evidence to support the district court's findings that Father was unfit by reason of conduct or condition which rendered him unable to care properly for A.M. and A.M.M., and the conduct or condition was unlikely to change in the foreseeable future. We also conclude the district court did not abuse its discretion in finding that termination of Father's parental rights was in the best interests of the children.

TERMINATION OF MOTHER'S PARENTAL RIGHTS

On appeal, Mother claims the district court erred in finding that she was unfit by reason of conduct or condition which rendered her unable to care properly for the minor children. Mother analyzes most of the statutory factors cited by the district court in terminating her parental rights, and she argues that there was insufficient evidence to support the district court's findings. Mother also claims the district court erred in finding that her conduct or condition is unlikely to change in the foreseeable future.

The decision to terminate Mother's parental rights is certainly not as clear as Father's. Unlike with Father, there is no direct evidence that Mother physically abused A.M.M. Mother ultimately was convicted of felony interference with a law enforcement officer and conspiracy to commit obstruction of prosecution. However, the record does

12

not reflect the factual basis for these convictions. The evidence established that Mother successfully completed the Triple P program. Although she often failed to stay in contact with SFCS, the evidence established that Mother interacted well with the children during visitations when she had a chance to visit. Mother was employed at Subway, although she apparently lied to Marquez about finding a job with Tyson. Based on our review of the record, we conclude there was insufficient evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(b)(2), (b)(4), and (c)(2). We will now proceed to analyze the remaining statutory factors.

*(b)(5) felony convictions by both parents*

Although there was no direct evidence that Mother physically abused A.M.M., she ultimately was convicted of felony interference with a law enforcement officer and conspiracy to commit obstruction of prosecution. Based on these convictions, there was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(b)(5).

*(b)(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family*

Schatz testified about the services she provided through the Triple P program, and Mother accepted these services. Marquez and Clark provided extensive testimony on the efforts made by SFCS to facilitate reintegration. Mother's argument that SFCS did not do enough to address parenting behavior is not supported by the record. The evidence established that on numerous occasions SFCS tried to address parenting behavior, but the parents refused to listen. Ultimately, SFCS worked with the parents for nearly 2 years to reintegrate the family. When asked at the termination hearing how close the parents were to reintegration, Marquez stated: "They weren't. They weren't close at all." We conclude there was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(b)(7).

13

*(b)(8) lack of effort on the part of the parents to adjust their circumstances, conduct, or conditions to meet the needs of the children*

Marquez testified that Mother often failed to maintain contact with the family support workers at SFCS, especially when it was time for drug testing. If a urinalysis was missed, the subsequent visit with the children was cancelled. Although Mother appeared to be gainfully employed, it cannot be said that she maintained stable housing for the children. Throughout most of the reintegration process, Mother resided with Father's mother, Maria, and her boyfriend, even though Maria had recently relinquished her parental rights of her two daughters. Reintegration was not possible as long as Mother and Father continued to live in Maria's home.

As the State correctly points out, Mother remained with Father, "a man who was convicted of grievously injuring [A.M.M.], would not work, showed very little interest in his children . . . , barely participated in case plan tasks," and as demonstrated above, was not fit to be a parent. When asked for her professional opinion about the likelihood of the children's reintegration with the parents, including Mother, Clark stated: "I don't think that they can parent them safely and adequately together for the children to be able to grow and be safe." When asked if this condition was likely to change in the reasonably foreseeable future, Clark stated: "I don't think so. I think that if they wanted to change that, that would have taken place by now." There was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(b)(8).

*(c)(1) failure to assure care of the child in the parental home when able to do so*

As previously discussed, when A.M. was taken into custody, she was not potty-trained despite being approximately 3 years old. Marquez stated that A.M. "wasn't used to the word no" and would have a tantrum if told no. This included physical altercations with the foster parents. A.M. had a limited vocabulary and Marquez testified that A.M. talked "very little" and "was hard to understand." A.M.M. also would throw fits. Mother

14

continued to reside in Maria's home during the reintegration process even though Maria had recently relinquished her parental rights of her two daughters. There was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(c)(1).

*(c)(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home*

As noted above, Mother failed several aspects of the reintegration plan. Among numerous smaller failures throughout the process, Mother's housing remained inadequate. The CINC petition was filed in this case on October 29, 2014, and the termination hearing was held on October 12, 2016. During that nearly 2-year process, Mother failed to sufficiently change her lifestyle to the extent necessary to reintegrate the children into the parental home. Further, the evidence at the termination hearing established that both children were doing well in their out-of-home placement.

A.M., who was almost 5 years old at the time of the termination hearing, had "been out of the home for two years," equaling nearly half of her life. A.M.M., who was approximately 3 1/2 years old at the time of the termination hearing, had also "been out of the home for two years," equaling a majority of his life. In determining whether Mother's conduct was likely to change in the foreseeable future, we are to consider "foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). There was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(c)(3).

*(c)(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay and work*

While Mother claimed she was currently making payments, at the time of the termination hearing she owed $3,355.87 in back child support. There was clear and convincing evidence to support termination of Mother's parental rights under K.S.A. 2016 Supp. 38-2269(c)(4).

To sum up, we note again that any one of the factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. After thoroughly reviewing all of the evidence in the record, viewed in the light most favorable to the State, we conclude there was clear and convincing evidence to support the district court's findings that Mother was unfit by reason of conduct or condition which rendered her unable to care properly for A.M. and A.M.M., and the conduct or condition was unlikely to change in the foreseeable future. We also conclude the district court did not abuse its discretion in finding that termination of Mother's parental rights was in the best interests of the children.

Affirmed.